UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FEENEY BROTHERS EXCAVATION LLC AND
FEENEY BROTHERS EXCAVATION
CORPORATION 401(k) PLAN,

       Plaintiffs,

      v.

MORGAN STANLEY & CO. LLC,  MORGAN
STANLEY PRIVATE BANK, N.A., MORGAN
STANLEY SMITH BARNEY LLC, AND
BRIAN F. MILLER,

       Defendants.

CIVIL ACTION
NO. 1:18-cv-12313-LTS

## FIRST AMENDED COMPLAINT

By this action, plaintiffs Feeney Brothers Excavation LLC ("Feeney Brothers") and the

Feeney Brothers Excavation Corporation 401(k) Plan (the "Plan") seek damages from defendants

Morgan Stanley & Co. LLC, Morgan Stanley Private Bank, N.A., Morgan Stanley Smith Barney

LLC (collectively "Morgan Stanley") and Brian F. Miller ("Miller"), an investment adviser

employed by Morgan Stanley, arising out of Miller's representations concerning Qualified

Pension Services, Inc. ("QPSI") and his recommendation that Feeney Brothers hire QPSI to

serve as the Plan's third-party administrator ("TPA").

Despite Miller's representations, QPSI was not qualified to serve as the Plan's TPA when

it was hired, and it became even more ill-suited to serve as TPA as the number of Plan

participants grew.  In fact, QPSI made two significant errors in administering the Plan –

discovered through audits in 2015 and 2016 – which Feeney Brothers and the Plan were required

to remedy.  Feeney Brothers and the Plan have sustained more than $1 million in losses in total

1

to pay additional Plan contributions required by the IRS, as well as attorneys' fees, in-house staff time, successor TPA fees, accountant fees, and IRS fees to address the errors.  These damages were the result of Miller's recommendation to hire QPSI during a pitch to secure Feeney Brothers' business as the Plan's investment advisor, and his omission of material facts in making that recommendation.

Once he became Plaintiffs' investment advisor, Miller and the Morgan Stanley Defendants owed a fiduciary duty to the Plan.  During the course of that fiduciary relationship, Miller knew and continued to learn facts demonstrating QPSI's unsuitability as the Plan's third-party administrator, but the Defendants did not disclose those facts to Plaintiffs.  Instead, he continued to praise QPSI and advocate for its retention.  This conduct, and other conduct detailed below, constitutes breach of fiduciary duty under 29 U.S.C. §§ 1104(a), 1109.  Though Defendants have indicated that their responsibility to the Plan's sound administration is fiduciary in nature, should they now claim otherwise, Plaintiffs assert, in the alternative, that Defendants' conduct also violates state law by constituting negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices.

## **PARTIES**

1.      Plaintiff Feeney Brothers is a limited liability company organized under the laws of the Commonwealth of Massachusetts and having a principal place of business of 103 Clayton Street, Dorchester, MA  02122.

2.      Plaintiff the Plan is the 401(k) plan provided to Feeney Brothers employees.  The Plan is administered at Feeney Brothers' principal place of business, 103 Clayton Street, Dorchester, MA  02122.

2

1116519

3.      Defendant Morgan Stanley & Co. LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 1585 Broadway Avenue, New York, NY  10036.  In Massachusetts, Morgan Stanley & Co. LLC's principal place of business is 1 International Place, 13th Floor, Boston, MA  02110.

4.      Defendant Morgan Stanley Smith Barney LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 1585 Broadway Avenue, New York, NY  10036.  Morgan Stanley Smith Barney LLC is registered to do business in the Commonwealth of Massachusetts.

5.      Defendant Morgan Stanley Private Bank, N.A. is a national bank with its principal place of business at 2000 Westchester Avenue, Purchase, NY, 10577.  Morgan Stanley Private Bank, N.A. is listed as Defendant Miller's current employer, with a branch office location located at 53 State Street, Boston, MA 02109.  *See* Exhibit 1 (SEC Investment Adviser Representative Public Disclosure Report of Brian Francis Miller).

6.      Defendant Morgan Stanley & Co. LLC, Defendant Morgan Stanley Smith Barney LLC, and Defendant Morgan Stanley Private Bank, N.A., including predecessor entities of each of the foregoing, will be referenced collectively as "Morgan Stanley."

7.      Defendant Brian F. Miller ("Miller") is an individual employed by or otherwise affiliated with Morgan Stanley as a First Vice President, Financial Advisor, & Corporate Retirement Director.  More specifically, according to the SEC Investment Adviser Representative Public Disclosure Report of Brian Francis Miller, Miller worked at Morgan Stanley Smith Barney LLC beginning in June 2009, and Morgan Stanley Private Bank, N.A. beginning in 2015.  He continues to be employed by Morgan Stanley, and his current business address is 53 State Street, Boston, MA  02109.  *See* Exhibit 1 (SEC Investment Adviser

3

1116519

Representative Public Disclosure Report of Brian Francis Miller). According to Miller's publicly available biography, he has worked for or been affiliated with Morgan Stanley (or a predecessor entity) since 1987.

## JURISDICTION

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Count III of the Complaint, and has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims stated herein took place in or around Boston, Massachusetts.

10. Alternatively, should the Defendants now take a position at odds from what they have previously argued, *i.e.*, if Defendants now contend (if the Court so determines) that the Employee Retirement Income Security Act does not provide a cause of action, then this Complaint should be remanded to Suffolk Superior Court, where it was filed. In that case, Suffolk Superior Court has jurisdiction under G.L. c. 212, § 4 and other provisions of state law.

## FACTS

### Background

11. Feeney Brothers was founded by two brothers in 1988 as a utility construction company and today is a leading service provider for the natural gas, electric, and telecommunications industries throughout New England.

12. The Plan is the 401(k) plan Feeney Brothers offers its employees for retirement savings.

1116519

13.    Morgan Stanley is a multinational investment bank and financial services company.  Among other business lines, Morgan Stanley provides investment advice to individual clients (including Plaintiffs).  For the second quarter ending June 30, 2019, Morgan Stanley earned over $10.2 billion in net revenue, reflecting $839 million in net revenue for its investment management services, with $497 billion in assets under management.

14.    Miller, who has been employed by Morgan Stanley since 1987, works as a First Vice President, Financial Advisor, and Corporate Retirement Director at Morgan Stanley.

15.    In or about 2009, the Plan retained Miller (and Morgan Stanley) as its investment advisor.

16.    At or near the same time, Feeney Brothers and the Plan also retained QPSI as the Plan's third-party administrator ("TPA"), based on Miller's recommendation that it do so in conjunction with retaining Miller as the Plan's investment advisor.

17.    In pitching his investment advisory services prior to Feeney Brothers retaining Miller, he stressed his expertise in assisting 401(k) plans — not just by providing investment advice, but also by ensuring that the Plan's administrative and regulatory needs were met by capable TPAs.  In that context, Miller represented to Feeney Brothers that QPSI had the aptitude, ability, and expertise to administer the Plan.  Miller expressly recommended that, on the basis of his representations concerning QPSI's qualifications, Feeney Brothers and the Plan retain QPSI as the Plan's TPA.

18.    QPSI was the only TPA about which Miller made such a representation and it was the only TPA Miller advised Feeney Brothers to hire.

1116519

19.    In recommending Plaintiffs hire QPSI as the Plan's TPA and making representations in connection with that recommendation, Miller was acting within the scope of his employment at Morgan Stanley.

20.    At the time Feeney Brothers retained QPSI, Feeney Brothers maintained a relatively small finance department with limited experience in 401(k) plan administration. Miller knew this fact, and marketed his services with it in mind:  as someone capable of meeting all needs arising from the Plan, either personally or through recommendations to what he purported to be qualified third-parties.

21.    In reliance upon Miller's expertise and advice, Feeney Brothers hired QPSI as the Plan's TPA.

22.    QPSI, however, was not qualified to be the Plan's TPA.  QPSI's business focused exclusively on the administration of small 401(k) plans, and QPSI was not equipped to handle the mid-sized and growing Plan.

23.    Miller knew or should have known that QPSI was not equipped to serve as Feeney Brother's TPA because, among other things, the Plan was larger than most plans administered by QPSI; QPSI lacked the aptitude, qualifications and experience to meet the Plan's needs; and those needs would grow only more complex and demanding as the Plan grew, rendering QPSI even more poorly suited for the TPA role.

24.    Instead Miller represented to Feeney Brothers and the Plan that QPSI ably provided services to other 401(k) plans with which Miller worked.  Miller did not mention, however, that those plans were much smaller, with needs far different than those of the Plan.

6

25.     Miller also represented to Feeney Brothers and the Plan that Miller knew and trusted QPSI's principal, Richard "Dick" Etling; Miller did not disclose, however, that Etling's business model focused exclusively on plans much smaller than the Plan.

26.     Moreover, and perhaps reflective of its small-plan client base, QPSI carried no insurance to protect it against losses caused by its failure to perform its duties as a TPA, a fact which Miller knew or at a minimum should have known, but which was not disclosed to Feeney Brothers.  Indeed, in the regular course, investment advisors that undertake to recommend TPAs regularly conduct diligence on prospective TPAs before making any such recommendations. Miller either undertook no such diligence or failed to share what he learned with Plaintiffs.

27.     When Miller pitched Feeney Brothers to hire him and Morgan Stanley to become the investment advisor to the Plan, Miller did so as part of a package.  He estimated the cost of his investment advisory services together with other administrative services (i.e., those of QPSI and those of the platform through which the Plan would be administered), and presented everything packaged into one price.  QPSI's TPA services were relatively low cost, making Miller's pitch to become the investment advisor to the Plan more attractive.

28.     Over recent years, as Feeney Brothers grew, so too did the number of Plan participants.  Miller and Morgan Stanley knew these facts well because, as investment advisor to the Plan, Miller and Morgan Stanley benefited from them in the form of ever-increasing fees.

29.     But as the Plan grew in size, QPSI became even less qualified to serve as its TPA. Of QPSI's approximately 300 clients, the Plan was its largest — by far.

30.     In fact, of QPSI's 300 clients, no more than a handful were 401(k) plans with more than 20 participants; in recent years, the Plan has had substantially more than 100 participants.

31.    In addition, QPSI provided TPA services exclusively to 401(k) plans that were not "large plans," i.e., those that were below the 100-participant threshold that under federal regulations triggers an annual public accounting audit of the Plan.

32.    For several years before 2014, the Plan neared the 100-participant threshold (as defined in federal regulations), and in 2014, the Plan crossed that threshold.  QPSI had no experience with administering a plan of that size and so notified Miller on numerous occasions.

33.    Though Miller was aware of QPSI's unsuitability to administer the Plan, Miller did not share that information with Plaintiffs and instead continued to recommend QPSI and package QPSI's services with Miller's own.  At least once annually — and as frequently as once per quarter — Miller met with Plaintiffs to discuss the Plan.  Often during those discussions he praised QPSI; never during those discussions did he raise what he knew about QPSI's unsuitability to perform the work for which he had recommended them or what he knew or should have known regarding QPSI's total lack of insurance coverage.  Instead, he continued to recommend to the Plan that it retain and extend its relationship with QPSI.

### Losses Incurred by the Plan & Feeney Brothers

34.    Feeney Brothers became aware of QPSI's inability to meet reasonable standards of professional diligence only following audits of the Plan completed in mid-October 2015 and mid-October 2016, respectively.

35.    The 2015 audit determined that an error had occurred when QPSI used its template documents to restate the Plan.  Feeney Brothers had approved QPSI's request to use its template documents under one condition:  that they not alter any material provision of the Plan (including without limitation that bonus compensation not fall within the Plan's definition of "compensation").

8

36.    Under the Plan as it existed before QPSI's use of its template documents, if Plan participants wanted to include cash bonuses in "compensation" for purposes of elective deferrals and matching contributions, they were required to make an affirmative election to do so.  QPSI's restatement of the plan, however, included bonuses in "compensation," whether or not a Plan participant affirmatively elected to include bonuses.

37.    QPSI did not inform Feeney Brothers of the resulting change to the Plan document, leaving the company unaware that it had occurred.

38.    Upon discovering the error in October 2015, Feeney Brothers immediately began operating the Plan in compliance with the terms as QPSI had restated them (i.e., by calculating elective deferrals and matching contributions using a definition of "compensation" that includes bonuses).  In addition, Feeney Brothers incurred substantial legal fees to file an application to the IRS's Voluntary Correction Program to address and resolve the issue.

39.    The 2016 audit identified erroneous guidance provided to Feeney Brothers by QPSI with respect to profit-sharing contributions to the Plan.  Federal rules require nondiscrimination between highly compensated employees ("HCEs") and non-highly compensated employees ("NHCEs") in connection with profit sharing contributions.  In 2010, based on guidance provided by QPSI, Feeney Brothers amended the Plan to alter its profit sharing contributions.  QPSI committed to perform the nondiscrimination tests associated with the altered contributions.

40.    However, the 2016 audit uncovered that the Plan amendments designed by QPSI and the nondiscrimination tests administered by it were defective and inconsistent with federal nondiscrimination rules.  To remedy this issue, Feeney Brothers again had to apply to the IRS's Voluntary Correction Program.

1116519

41.    All told, Miller's recommendation to hire QPSI and QPSI's substandard performance caused Feeney Brothers to incur the following damages:  $676,950 in additional Plan contributions required by the IRS; more than $175,000 in attorneys' fees to remedy Plan defects and work with the IRS to achieve compliance through the Voluntary Correction Program; approximately $100,000 in Feeney Brothers in-house staff time to prepare the Voluntary Correction Program submission and remedy Plan defects; $50,845 in successor TPA fees for time devoted to remedying the Plan defects; $12,000 to accountants to identify and address the Plan defects; and $7,500 in fees to the IRS for participation in the Voluntary Correction Program.  In sum, Feeney Brothers and the Plan have sustained more than $1 million in losses.

## COUNT I
### Negligent Misrepresentation Before the Establishment of a Fiduciary Relationship
### (under Massachusetts law)

42.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 41 as if fully set forth herein.

43.    Prior to Miller's and Morgan Stanley's engagement to provide investment advice to the Plan, Miller made knowingly or negligently inaccurate representations concerning QPSI, its aptitude and expertise, and its suitability to provide TPA services to the Plan.  Among other things, Miller represented that QPSI was perfectly suited to administer the Plan; that it had a lengthy track record of successful administration of similar plans; and that it would be a responsible, cost-effective option for the Plan.

44.    In making those representations, Miller held himself out as an expert, and invited Feeney Brothers — which, at the time, had a small finance department, and limited 401(k)-related experience — to rely upon Miller's expertise.  Miller advised Feeney Brothers and the Plan to retain QPSI and only QPSI.

1116519

45.     In reasonable reliance on Miller's expertise, representations, and recommendation, Feeney Brothers and the Plan then retained QPSI.

46.     But for Miller's representations and advice, neither Feeney Brothers nor the Plan would have retained QPSI; nor would either entity have believed that QPSI had the professional capacity to do the work for which it was hired.

47.     Feeney Brothers and the Plan were damaged as a direct and proximate result of Miller's negligent misrepresentations made before Defendants became fiduciaries to the Plan, as described herein.

## COUNT II
### Fraudulent Inducement Before the Establishment of a Fiduciary Relationship
### (under Massachusetts Law)

48.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 47 as if fully set forth herein.

49.     When Miller pitched Feeney Brothers and the Plan to hire him and Morgan Stanley as investment advisor to the Plan, Miller presented his services as part of a package with those of QPSI and those of the platform provider.

50.     In so doing, Miller provided an estimated total cost for annual services.  That cost was artificially low, because Miller had recommended a TPA on the basis of cost rather than qualifications, aptitude, and ability.

51.     Miller knew or should have known that QPSI was not qualified to serve as the Plan's TPA.

52.     Relying on Miller's expertise and representations regarding QPSI's aptitude, Feeney Brothers and the Plan retained Miller's and Morgan Stanley's services and those of QPSI as part of the package that Miller had presented.

11

53.     Accordingly, Miller made material misrepresentations, which benefited Miller and Morgan Stanley in the form of investment advisory fees, but which did not benefit the Plan (as it was left with an unsuitable TPA).

54.     As a direct and proximate result of these representations by Miller (made within the scope of his employment at Morgan Stanley), Plaintiffs have suffered damages as described herein.

## COUNT III
### Breach of Fiduciary Duties under ERISA, 29 U.S.C. §§ 1104, 1109(a)

55.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 54 as if fully set forth herein.

56.     Once Miller and the Morgan Stanley Defendants were retained by Plaintiffs to act as their investment advisor in 2009 and to meet Defendants' promises to ensure that the Plan was well-administered by recommended vendors, Defendants had a fiduciary duties to the Plan.

57.     As a fiduciary, the Defendants were obligated to discharge their duties with respect to the Plan "solely in the interest of the participants and beneficiaries and[] for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the [P]lan."  29 U.S.C. § 1104(a)(1)(A).

58.     In doing so, Defendants were required to act with "care, skill, prudence, and diligence."  29 U.S.C. § 1104(a)(1)(B).

59.     Morgan Stanley and Miller pitched their services – along with those of QPSI – as a package, stating that together they were capable of meeting all of Plaintiffs' ERISA needs, including providing investment advice to the Plan and ensuring the Plan was well administered.

12

1116519

60.     Having undertaken both to provide investment advice and to ensure the sound administration of the Plan, Defendants had the fiduciary responsibility to ensure that the TPA they recommended was well-suited to the task that Defendants assumed.

61.     Defendants, however, did not act with the requisite care, skill, prudence, or diligence when Miller continued to praise, bolster, and recommend QPSI's services as the Plan grew.

62.     Miller knew or should have known that QPSI was ill-suited to serve as Plaintiffs' TPA because of QPSI's lack of experience with large plans and because of its failure to obtain insurance coverage of the type any TPA hired by a larger plan would obtain as a matter of course.

63.     Indeed, Miller was told directly by QPSI that QPSI and its principal Richard "Dick" Etling only worked with smaller plans, all involving significantly fewer and less complex issues than the Plan.  Defendants never relayed that information to the Plan, despite a fiduciary responsibility to do so.

64.     Miller also knew or should have known that QPSI lacked insurance to protect it against losses caused by its failure to perform its duties as a TPA, but Miller either did not undertake to learn that information or failed to share it with the Plaintiffs.

65.     When the Plan crossed the 100-participant threshold (as defined in federal regulations), QPSI notified Miller that it had no experience with administering a plan of that size. Again, the Defendants did not disclose this fact to Plaintiffs and instead continued to recommend QPSI's services to Plaintiffs.

66.     As a fiduciary, the Defendants were obligated to disclose these material facts to Plaintiffs in connection with their continued engagement of QPSI as their TPA.

13

1116519

67.     The Defendants' initial and continuing recommendations to hire QPSI and Miller's failure to disclose material facts to Plaintiffs constitute a breach of their fiduciary duties to the Plan under 29 U.S.C. §§ 1104, 1109(a).

68.     As a result of Defendants' wrongful conduct, Plaintiffs suffered over $1 million in losses, including additional Plan contributions required by the IRS, as well as attorneys' fees, in-house staff time, successor TPA fees, accountant fees, and IRS fees all incurred to remedy Plan defects.

## COUNT IV
### Negligent Misrepresentation After the Establishment of a Fiduciary Relationship
### (under Massachusetts law)

69.     In the alternative to the claim set forth in Count III, Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 68 as if fully set forth herein.

70.     Once retained as Plaintiffs' investment advisor, Miller continued to make inaccurate representations concerning QPSI and failed to disclose material facts regarding QPSI's suitability to act as the Plan's TPA.

71.     In reasonable reliance on Miller's representations and continued recommendation of QPSI as a packaged deal with Miller's investment advisory services, Feeney Brothers and the Plan maintained its relationship with QPSI as its TPA.

72.     QPSI's unsuitability as a TPA for the Plan increased as the number of participants in the Plan grew.

73.     Nevertheless, Miller praised the work of QPSI, continued to recommend its services, and never raised any concerns regarding its ability to administer a growing Plan.

74.     But for Miller's representations and omissions, neither Feeney Brothers nor the Plan would have continued its relationship with QPSI.

14

1116519

75.    Feeney Brothers and the Plan were damaged as a direct and proximate result of Miller's negligent misrepresentations made after the Defendants became fiduciaries to the Plan, as described herein.

## COUNT V
**Breach of the Covenant of Good Faith and Fair Dealing After the Establishment of a Fiduciary Relationship (under Massachusetts Law)**

76.    In the alternative to the claim set forth in Count III, Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 75 as if fully set forth herein.

77.    Feeney Brothers and the Plan contracted with Miller and Morgan Stanley to provide investment advisory services to support the Plan and its participants.

78.    In every contract, there is an implied covenant that the parties shall act in good faith, deal fairly with one another, and not undertake efforts that would deprive the other of the benefits of their contract.

79.    At all times, Plaintiffs acted in good faith and dealt fairly with Defendants in connection with their rights and obligations pursuant to the parties' contract.

80.    Defendants, however, did not act in good faith or deal fairly with Plaintiffs.

81.    Miller knew that QPSI was providing administrative services that it was ill-equipped to provide, thereby potentially damaging the Plan and compromising its assets — and undercutting the very services that Defendants had been contracted with to provide.

82.    Miller also knew, or at a minimum should have known, that QPSI did not carry insurance to cover any losses caused by its failure to perform its duties as a TPA.

83.    Miller did not raise these concerns; nor did Miller share his knowledge that QPSI typically works with much smaller clients, even as the Plan continued to grow and eventually crossed the 100-participant threshold.

15

1116519

84.     In fact, although Etling informed Miller on numerous occasions that QPSI had no experience handling a plan that had reached this threshold, Miller failed to disclose this information to Plaintiffs.

85.     Instead, Miller continued to praise QPSI and recommend that the Plan extend its relationship with QPSI as a packaged deal for services administering and advising the Plan.

86.     When comprehensive audits were undertaken in 2015 and 2016, they uncovered the considerable consequences of QPSI's inaptitude.

87.     As a result of Defendants' bad faith and unfair dealing, Defendants benefitted from their contractual relationship with QPSI and Plaintiffs, receiving investment advisory fees, but deprived Plaintiffs of the benefits they were entitled to receive under the parties' contract.

88.     As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages as described herein.

## COUNT V
### Violation of M.G.L. c. 93A

89.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 88 as if fully set forth herein.

90.     Plaintiffs and Defendants are each engaged in the conduct of trade and commerce within the meaning of G.L. c. 93A, §1(b).

91.     The above-described conduct of Defendants constitutes unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of G.L. c. 93A, §§ 2 and 11.

92.     The above-described conduct of Defendants occurred primarily and substantially within the Commonwealth of Massachusetts.

93.     As a result of Defendants' wrongful acts and conduct, Plaintiffs have suffered substantial losses as described herein.

16

1116519

94.     Defendants' violations of G.L. c. 93A were willful and/or knowing, and Defendants are therefore liable to Plaintiffs for treble damages, in accordance with G.L. c. 93A, §§ 2 and 11.

95.     Plaintiffs are also entitled to an award of reasonable attorneys' fees and costs incurred in this action as a result of Defendants' violations of G.L. c. 93A, § 2.

WHEREFORE, Plaintiffs respectfully ask this Court to:

1. Enter judgment for Plaintiffs on all counts of this Complaint;

2. Award monetary damages to Plaintiffs in an amount to be proved at trial;

3. Award treble damages to Plaintiffs, as provided by G.L. c. 93A, § 11, for Defendants' violation of G.L. c. 93A, §2;

4. Award Plaintiffs their costs and attorneys' fees; and

5. Award such further relief as the Court deems just and proper.

## **JURY DEMAND**

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

Respectfully submitted,

FEENEY BROTHERS EXCAVATION LLC AND THE FEENEY BROTHERS EXCAVATION CORPORATION 401(k) PLAN

By its Attorneys,

/s/  Donna A. Mizrahi
Michael Patrick Moore, Jr., BBO# 670323
Donna A. Mizrahi, BBO# 678412
HEMENWAY & BARNES LLP
75 State Street
Boston, Massachusetts 02109
(617) 227-7940

Dated:   August 12, 2019

1116519

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the CM/ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing.


<u>/s/ Donna A. Mizrahi</u>
Donna A. Mizrahi

1116519