UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FEENEY BROTHERS EXCAVATION LLC, and FEENEY BROTHERS EXCAVATION CORPORATION 401(k) PLAN, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 18-12313-LTS |
| MORGAN STANLEY & CO. LLC, MORGAN STANLEY PRIVATE BANK, N.A., MORGAN STANLEY SMITH BARNEY LLC, and BRIAN F. MILLER, | ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER ON MOTION TO DISMISS (DOC. NO. 40)

May 18, 2020

SOROKIN, J.

Plaintiffs Feeney Brothers Excavation LLC ("Feeney Brothers") and Feeney Brothers Excavation Corporation 401(k) Plan ("the Plan") first brought this action in the Suffolk County Superior Court of Massachusetts alleging various state law causes of action against defendants Morgan Stanley & Co. LLC, Morgan Stanley Private Bank, N.A., Morgan Stanley Smith Barney (together, "Morgan Stanley"), and Brian F. Miller. Doc. No. 1-1.[1] Defendants removed the action to this Court and successfully opposed its remand to state court on the grounds that Plaintiffs' state law claims are preempted by the Employee Retirement Income Security Act of 1974 (ERISA). Doc. No. 1 at 4; Doc. No. 36 at 15-16 (denying Plaintiff's motion to remand to state court).

---

[1] Citations to "Doc. No. __" reference documents appearing on the court's electronic docketing system; pincites are to the page numbers in the ECF header.

Defendants now move to dismiss Plaintiffs' complaint in its entirety. Doc. No. 40. The motion is fully briefed, and the Court heard oral argument on May 12, 2020. After reviewing the parties' submission and arguments, the Court ALLOWS Defendants' motion to dismiss Count III of the Complaint, but otherwise DENIES Defendants' motion.

I. BACKGROUND

A. Plaintiffs' Allegations[2]

Feeney Brothers was founded by two brothers in 1988 as a utility construction company and today is a leading service provider for the natural gas, electric, and telecommunications industries throughout New England. Doc. No. 38 (Amended Complaint) ¶ 11. The Plan is the 401(k) plan Feeney Brothers offers its employees for retirement savings. Id. ¶ 12. Morgan Stanley provides investment advice to individual clients (including Plaintiffs). Id. ¶ 13. In or about 2009, the Plan retained Morgan Stanley as its investment advisor. Id. ¶ 15.

Defendant Brian F. Miller ("Miller") is an individual employed by or otherwise affiliated with Morgan Stanley as a First Vice President, Financial Advisor, & Corporate Retirement Director. Id. ¶ 7. Miller worked at Morgan Stanley Smith Barney LLC beginning in June 2009, and Morgan Stanley Private Bank, N.A. beginning in 2015. Id. He continues to be employed by Morgan Stanley. Id.

In pitching his investment advisory services to Feeney Brothers, Miller stressed his expertise in assisting 401(k) plans, not just by providing investment advice but also by ensuring that the Plan's administrative and regulatory needs were met by capable third-party administrators (TPAs). Id. ¶ 17. In that context, Miller represented to Feeney Brothers that Qualified Pension Services, Inc. ("QPSI") had the aptitude, ability, and expertise to administer the Plan. Id. Miller

---

[2] The factual allegations that follow are drawn from the Amended Complaint (Doc. No. 38).

represented that QPSI was perfectly suited to administer the Plan; that it had a lengthy track record of successful administration of similar plans; and that it would be a responsible, cost-effective option for the Plan. Id. ¶ 43. On the basis of his representations concerning QPSI's qualifications, Miller expressly recommended that Feeney Brothers and the Plan retain QPSI as the Plan's TPA. Id. ¶ 17. The only TPA about which Miller made such representations, and the only TPA he advised Feeney Brothers to hire, was QPSI. Id. ¶ 18.

In reliance on Miller's expertise and advice, Feeney Brothers hired QPSI as the Plan's TPA. Id. ¶ 21. But QPSI was not qualified to be the Plan's TPA because its business focused exclusively on the administration of small 401(k) plans, and it was not equipped to handle the mid-sized and growing Plan. Id. ¶ 22. Miller knew or should have known that QPSI was not equipped to serve as Feeney Brother's TPA because, among other things: (a) the Plan was larger than most plans administered by QPSI; (b) QPSI lacked the aptitude, qualifications and experience to meet the Plan's needs; and (c) those needs would grow only more complex and demanding as the Plan grew, rendering QPSI even more poorly suited for the TPA role over time. Id. ¶ 23.

Miller represented to Feeney Brothers and the Plan that QPSI had ably provided services to other 401(k) plans with which Miller worked but did not mention that those plans were much smaller, with needs far different than those of the Plan. Id. ¶ 24. Miller also represented to Feeney Brothers and the Plan that Miller knew and trusted QPSI's principal, Richard "Dick" Etling but did not disclose that Etling's business model focused exclusively on plans much smaller than the Plan. Id. ¶ 25.

QPSI carried no insurance to protect it against losses caused by its failure to perform its duties as a TPA. Id. ¶ 26. Miller knew or should have known that QPSI carried no insurance, but he did not disclose this fact to Feeney Brothers. Id. Investment advisors that undertake to

recommend TPAs regularly conduct diligence on prospective TPAs before making any such recommendations.  Id.  Miller either undertook no such diligence or failed to share what he learned with Plaintiffs.  Id.

Miller pitched Feeney Brothers to hire him and Morgan Stanley to become the investment advisor to the Plan as part of a package that included QPSI and the platform through which the Plan would be administered.  Id. ¶ 27.  QPSI's TPA services were relatively low cost, making Miller's pitch to become the investment advisor to the Plan more attractive.  Id.

As Feeney Brothers grew over recent years, so too did the number of Plan participants.  Id. ¶ 28.  Miller and Morgan Stanley knew these facts.  Id.  As the Plan grew in size, QPSI became even less qualified to serve as its TPA.  Id. ¶ 29.  Of QPSI's approximately 300 clients, the Plan was by far its largest.  Id.  No more than a handful of QPSI's 300 clients were 401(k) plans with more than 20 participants; in recent years, the Plan has had substantially more than 100 participants.  Id. ¶ 30.

QPSI provided TPA services exclusively to 401(k) plans that were not "large plans," i.e., those that were below the 100-participant threshold that under federal regulations triggers an annual public accounting audit of the Plan.  Id. ¶ 31.  The Plan neared the 100-participant threshold several years before 2014 and crossed that threshold in 2014.  Id. ¶ 32.  QPSI had no experience with administering a plan of that size and so notified Miller on numerous occasions.  Id. ¶ 33.

Though Miller was aware of QPSI's unsuitability to administer the Plan, he did not share that information with Plaintiffs and instead continued to recommend QPSI and package QPSI's services with Miller's own.  Id. ¶ 33.  Miller met with Plaintiffs to discuss the Plan at least once annually, and as frequently as once per quarter.  Id.  Miller often praised QPSI during those discussions.  Id.  He never raised what he knew about QPSI's unsuitability to perform the work

for which he had recommended them, or what he knew or should have known regarding QPSI's complete lack of insurance coverage. Id. Instead, he continued to recommend to the Plan that it retain and extend its relationship with QPSI. Id.

Feeney Brothers first became aware of QPSI's inability to meet reasonable standards of professional diligence following audits of the Plan completed in mid-October 2015 and mid-October 2016. Id. ¶ 34. As a result of the errors caused by QPSI, Feeney Brothers incurred the following damages: $676,950 in additional Plan contributions required by the IRS; more than $175,000 in attorneys' fees to remedy Plan defects and work with the IRS to achieve compliance through the Voluntary Correction Program; approximately $100,000 in Feeney Brothers in-house staff time to prepare the Voluntary Correction Program submission and remedy Plan defects; $50,845 in successor TPA fees for time devoted to remedying the Plan defects; $12,000 to accountants to identify and address the Plan defects; and $7,500 in fees to the IRS for participation in the Voluntary Correction Program—a total of more than $1 million in losses. Id. ¶ 41.

B.   Procedural History

In their original complaint, Plaintiffs alleged four state law causes of action—negligent misrepresentation, fraudulent inducement, breach of the covenant of good faith and fair dealing, and violation of G.L. c 93A—relating to Defendants' alleged recommendation of QPSI as third-party administrator of the Plan. Doc. No. 1 at 2. Defendants removed to this Court pursuant to 28 U.S.C. § 1441(a) on the grounds that Plaintiffs' state law causes of action actually arise under Section 502(e) of ERISA, which provides federal courts with original jurisdiction to hear such actions. Doc. No. 1 at 4 (citing 29 U.S.C. § 1132(e)). Plaintiffs moved to remand back to state court. Doc. No. 15. Defendants opposed on the grounds that the Plaintiffs' claims are completely

preempted by ERISA because those claims are based on alleged fiduciary status and fiduciary conduct arising under ERISA.  Doc. No. 19.

During oral argument on Plaintiffs' motion to remand, the Court determined that Plaintiffs have asserted two categories of claims: (a) claims of negligent misrepresentation and fraudulent inducement relating to the formation of Plaintiffs' contractual relationship with Defendants, and (b) claims of negligent misrepresentation, breach of the covenant of good faith and fair dealing, and unfair trade practices under Chapter 93A, all of which relate to Defendants' conduct after they were retained by Plaintiffs.  Doc. No. 36 at 15-16.  Holding it had original jurisdiction over the second category of claims because they are preempted by Section 502 of ERISA, and supplemental jurisdiction over the remaining claims, the Court denied Plaintiffs' motion to remand.  Id.

Plaintiffs subsequently filed an amended complaint alleging six causes of action that fall into three categories: (a) state law claims of negligent misrepresentation and fraudulent inducement relating to Defendants' pre-retention conduct (Counts I and II); (b) breach of fiduciary duties under ERISA, 29 U.S.C. §§ 1104, 1109(a), relating to Defendants' post-retention conduct (Count III); and (c) state law claims of negligent misrepresentation, breach of the covenant of good faith and fair dealing, and unfair trade practices under Chapter 93A, also relating to Defendants' post-retention conduct (Counts IV, V, and VI).  Doc. No. 38.  Plaintiffs assert the third category of claims in the alternative, in the event the Court determines that Defendants were not acting in a fiduciary capacity when they undertook the post-retention challenged conduct.  Id. at 2.

Defendants now move to dismiss the Complaint in its entirety.  Doc. No. 40.  For the reasons that follow, Defendants' motion is ALLOWED as to Count III but is otherwise DENIED.

## II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The complaint must also "set forth 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.'"  Berner v. Delahanty, 129 F.3d 20, 25 (1st Cir. 1997) (quoting Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988)).  Courts must "take all factual allegations [in the Complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff."  Rodríguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).

## III. DISCUSSION

### A. Plaintiffs' pre-retention negligent misrepresentation claim (Count I)

Plaintiffs have adequately pleaded their state law claim of pre-retention negligent misrepresentation (Count I).  Defendants contend that Count I fails to state a claim because "at the time Defendants made [their] alleged initial representations, they were true."  Doc. No. 41 at 21. But Plaintiffs have alleged the initial statements were misrepresentations, Doc No. 38 ¶¶ 23-26, 43.  The Court declines the invitation to resolve a factual question on a Rule 12 motion contrary to the governing legal standard which requires the Court to accept all non-conclusory facts alleged in the Complaint as true, Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011), and to draw all reasonable inferences in favor of Plaintiffs, Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009).  Defendants also contend that Plaintiffs did not adequately allege reliance on Defendants' alleged misrepresentation. Doc. No. 41 at 22-23.  That contention is belied by Plaintiffs' clear allegations of such reliance.  See Doc. No. 38 ¶¶ 21, 45, 71.  Whether such

reliance was reasonable is a question of fact that cannot be resolved on a motion to dismiss. See, e.g., Rodi v. S. New England Sch. Of Law, 389 F.3d 5, 17 (1st Cir. 2004) ("Under Massachusetts law, the reasonableness of a party's reliance ordinarily constitutes a question of fact for the jury.").

The Court therefore DENIES Defendants' motion to dismiss Count I of the Complaint.

B.  Plaintiffs' pre-retention fraudulent inducement claim (Count II)

To state a claim for fraudulent inducement, a claimant must allege facts plausibly suggesting that the defendants knowingly made a false statement of material fact, that they did so for the purpose of inducing the claimant to act on it, and that the claimant reasonably relied upon that false statement to his detriment. See, e.g., Masingill v. EMC Corp., 870 N.E.2d 81, 88 (2007) ("To recover for fraudulent misrepresentation, a plaintiff 'must allege and prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.'") (quoting Kilroy v. Barron, 326 Mass. 464, 465, 95 N.E.2d 190 (1950)). Plaintiffs' allegations easily meet this test. See Doc. No. 38, ¶¶ 7, 15-33, 41, 48-54.

Nevertheless, Defendants contend that Plaintiffs' pre-retention fraudulent inducement claim (Count II) fails because it is not pled with particularity as required by Rule 9(b). Doc. No. 41 at 23. "Under Rule 9(b), [plaintiffs] must state the who, what, where, and when of the allegedly [misleading] representation with particularity." Ezell v. Lexington Ins. Co., 926 F.3d 48, 51 (1st Cir. 2019). Here, Plaintiffs have alleged the identity of the person(s) making the representation, the contents of the misrepresentation, and when it took place. See Doc. No. 38, ¶¶ 7, 15-33, 41, 48-54. Although Plaintiffs do not allege where the misrepresentations took place, it is reasonable to infer from their allegations that these took place either at the offices of Feeney Brothers or of Defendant Miller. That is sufficient to satisfy the pleading standard at this stage of the proceedings.

The Court therefore DENIES Defendants' motion to dismiss Count II of the Complaint.

C.     Plaintiffs' ERISA cause of action (Count III)

Defendants make three arguments in support of their motion to dismiss Plaintiffs' ERISA cause of action (Count III): (a) ERISA does not authorize the relief Plaintiffs seek; (b) Plaintiffs have failed to plead fiduciary status as to the challenged conduct; and (c) challenged conduct that took place before 2012 is not actionable under ERISA's six-year statute of repose. Doc. No. 41 at 12-17. Because Plaintiffs failed to plead fiduciary status as to the challenged conduct, the Court dismisses Count III on this ground and need not address Defendants' other two arguments.

In their claim for breach of fiduciary duties under ERISA, Plaintiffs allege that Miller and Morgan Stanley became functional fiduciaries to the Plan when they were retained by Plaintiffs in 2009 to act as their investment advisor and promised to ensure that the Plan would be well-administered by third-party administrators they recommended. Doc. No. 38 ¶ 56. "Morgan Stanley and Miller pitched their services—along with those of QPSI—as a package, stating that together they were capable of meeting all of Plaintiffs' ERISA needs, including providing investment advice to the Plan and ensuring the Plan was well administered." Id. ¶ 59. Plaintiffs also allege that Defendants failed to perform their fiduciary duties with the requisite care, skill, prudence, and diligence, or to act solely in the interest of the participants and beneficiaries of the Plan, as ERISA requires, "when Miller continued to praise, bolster, and recommend QPSI's services as the Plan grew" despite QPSI's inaptitude and lack of experience with plans as large as the Plan. Doc. No. 38 ¶¶ 57-58, 61-62.

Defendants contend that despite these allegations, Plaintiffs have failed to state a claim for breach of fiduciary duty under ERISA because they do not allege that Defendants were fiduciaries with respect to the challenged conduct—i.e., their recommendation that QPSI administer the Plan.

9

Doc. No. 41 at 14. "The key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets." Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998); see also Cottrill v. Sparrow, Johnson & Ursillo, 74 F.3d 20, 22 (1st Cir. 1996) (emphasizing the exercise of discretion as a requirement of fiduciary status under ERISA).

Here, Plaintiffs have not alleged that Defendants exercised discretionary authority in respect to, or meaningful control over, an ERISA plan or its administration. Plaintiffs do allege that Defendants initially recommended and continued to recommend QPSI to administer the Plan despite the latter's inaptitude and lack of experience—which facts were known to Defendants at the time—but that is not an allegation that Defendants had or exercised any actual authority or discretion with respect to the Plan sufficient to trigger fiduciary status or responsibility over its administration. Plaintiffs do not allege Defendants had any authority or discretion to hire QPSI, or that Defendants had any responsibility or authority with respect to supervising, monitoring, or directing QPSI in its role as the Plan's TPA, or that Defendants even had any involvement in drafting, approving, or implementing the Plan amendments or the Plan profit-sharing provisions at issue. That Defendants were admittedly fiduciaries for purposes of investment advisory services does not, without more—and there is not more here—render them fiduciaries for the separate purpose of plan administration.

Therefore, the Court ALLOWS Defendants' motion to dismiss Count III of the Complaint.

D.      Plaintiffs' alternative state law claims (Counts IV – VI)

Defendants move to dismiss Plaintiffs' alternative state law causes of action (Counts IV – VI)—negligent misrepresentation, breach of the covenant of good faith and fair dealing, and unfair trade practices under Chapter 93A relating to Defendants' post-retention conduct—on the grounds

that they are all expressly preempted by Section 514 of ERISA, and that, in any event, they each fail to state a claim for relief. Doc. No. 41 at 17-25.

1. <u>The alternative state law causes of action are not preempted.</u>

Plaintiffs concede that Counts IV to VI are alternative claims to Count III. Doc. No. 38 at 2 ("Though Defendants have indicated that their responsibility to the Plan's sound administration is fiduciary in nature, should they now claim otherwise, Plaintiffs assert, in the alternative, that Defendants' conduct also violates state law by constituting negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices."). Of course, the Rules permit pleading in the alternative. Fed. R. Civ. P. 8(d)(2) ("A party may set out two or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."); <u>see also</u> <u>Elena v. Municipality of San Juan</u>, 677 F.3d 1, 8 (1st Cir. 2012) ("[T]he rules are clear that alternative pleadings are proper.").

Defendants argue that even if the Court dismisses Count III, as they urge the Court to do, and as the Court has done, Plaintiffs' alternative state law claims must also be dismissed because they are expressly preempted under Section 514 of ERISA. Doc. No. 41 at 17-20. Section 514 provides in relevant part: "Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a). "State law" is expansively defined under ERISA to include "all laws, decisions, rules, regulations, or other State action having the effect of any law, of any State." 29 U.S.C. § 1144(c)(1).

The First Circuit has observed that "drawing the line between those state laws that 'relate to' ERISA-regulated plans, and those that are only 'tenuous, remote or peripheral' has proven to be considerably difficult in practice, producing an 'avalanche of litigation.'" <u>Hampers v. W.R.</u>

11

Grace & Co., 202 F.3d 44, 49 (1st Cir. 2000) (quoting De Buono v. NYSA-ILA Med. & Clinical Serv. Fund, 520 U.S. 806, 809 n.1 (1997)). Perhaps not surprisingly, judicial construction of the key term "relate to" has narrowed its reach over time:

> [T]he phrase 'relate to,' as used in ERISA's preemption provision, cannot be read literally. "If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course. . . ." To scale the phrase done to size, the [Supreme] Court has devised a disjunctive test: "A law relates to a covered employee benefit plan for purposes of § 514(a) if it [1] has a connection with or [2] a reference to such a plan."

Carpenters Local Union No. 26 v. United States Fid. & Guar. Co., 215 F.3d 136, 140 (1st Cir. 2000) (quoting New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995) and Cal. Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 324 (1997). That said, the Court also acknowledged that this narrower articulation of "relates to" "still leaves us to question whether the [state] laws [at issue] have a 'connection with' the ERISA plans, and here an uncritical literalism is no more help than in trying to construe 'relate to.'" New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 656 (1995). Thus, the Court concluded that "[w]e simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." Id. The Court went on to explain that ERISA's expansive preemption provision is designed "to ensure that employee benefit plan regulation would be exclusively a federal concern." Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (internal quotation marks and citation omitted). And it further directed that courts examine "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." Id.

"ERISA's objectives include providing a 'uniform national administration of ERISA plans' and avoiding inconsistent state regulation of such plans." Zipperer v. Raytheon Co., 493 F.3d 50,

53 (1st Cir. 2007) (quoting Danca v. Private Health Care Sys., Inc.,185 F.3d 1, 7 (1st Cir. 1999)). ERISA is a "comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." Shaw v. Delta Air Lines, 463 U.S. 85, 90 (1983) (citations omitted); see also id., 463 U.S. at 99 (noting that one purpose of ERISA was to "eliminate the threat of conflicting or inconsistent State and local regulation of employee benefit plans"); Crespo v. Candela Laser Corp., 780 F. Supp. 866 (D. Mass. 1992) (explaining ERISA's "two-fold intent: to protect employees from the consequences of underfunding of pension and welfare benefit plans, as well as to protect employers from inconsistent state and local regulation of such plans").

In light of these considerations, the Supreme Court has identified three categories of state regulation as conflicting with ERISA's objectives: "1) those that mandate employee benefit structures or their administration; 2) those that bind plan administrators to a particular choice; and 3) causes of action that provide alternative enforcement mechanisms to ERISA's own enforcement scheme." Zipperer, 493 F.3d at 53 (citing Travelers, 514 U.S. at 658-59).

Here, Defendants argue only that Plaintiffs' post-retention state law causes of action are preempted under the third category—that is, that they provide alternative enforcement mechanisms to ERISA's own enforcement scheme. Doc. No. 41 at 18. The First Circuit has explained that "ERISA will be found to preempt state-law claims if the trier of fact necessarily would be required to consult the ERISA plan to resolve the plaintiff's claims." Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 281 (1st Cir. 2000). As Judge Saylor has observed, claims on behalf of plans, . . . against third-party administrators for breach of contract or professional malpractice generally have not been found to be preempted" because such claims do "'not necessarily affect the relationships regulated under ERISA among employer, plan, participant, and beneficiary.'" W.E. Aubuchon Co. v. BeneFirst, LLC, 661 F. Supp. 2d 37, 47 (D. Mass. 2009) (quoting Geweke

13

Ford v. St. Joseph's Omni Preferred Care, 130 F.3d 1355, 1359 (9th Cir. 1997)). Similarly, in Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294 (1st Cir. 2005), the First Circuit rejected a preemption challenge by certain pharmacy benefit managers to certain state law regulations because they were "outside of the intricate web of relationships among the principal players in the ERISA scenario" and because ERISA "is not designed to regulate or afford remedies against entities that provide services to plans." 429 F.3d at 305 (internal quotation marks and citation omitted).

Here, Plaintiffs and Defendants are regulated ERISA participants, but the conduct Plaintiffs challenge—the alleged recommendations, representations and omissions—undisputedly were made by Defendants outside the scope of their ERISA role. They were neither acting in their fiduciary role as investment advisors nor in a functional fiduciary role. Just as ERISA would not preempt a state law claim for negligent misrepresentation made by Plaintiffs against a third-party stranger to the Plan for a faulty recommendation, the same applies to Plaintiffs' claim against Defendants here. None of the concerns animated by the preemption provision are implicated.

Simply put, at their core, the three post-retention state law claims are not alternative enforcement mechanisms to the ERISA statutory scheme masquerading as state law claims but are rather an effort to enforce independent state law duties. The three claims all boil down to claims that Defendants knew or should have known that QPSI was not qualified to administer a plan as large as the Plaintiff Plan[3] and that QPSI lacked insurance, but that they failed to inform Plaintiffs

---

[3] This assertion does not require preemption under the reasoning of Vartanian v. Monsanto Co., 14 F.3d 697 (1st Cir. 1994). The First Circuit rendered that decision in 1994 before the Supreme Court explained the three categories of regulation that conflict with ERISA's objections in Travelers the following year. 514 U.S. at 658-59. In Vartanian, the plaintiff sought to advance a state law claim of misrepresentation against his employer (the Plan Sponsor) in lieu of an ERISA breach of fiduciary duty claim arising from the misrepresentations because, for reasons not material here, he lacked standing to bring the ERISA claim. Plainly, he advanced a

14

of these facts and instead continued to recommend QPSI as the Plan's third-party administrator. These claims implicate what Defendants knew about QPSI's competence and the size of the Plaintiff Plan as well as under what circumstances Massachusetts imposes a duty on businesses when recommending the professional services of others, the scope of that duty, and whether any breach of that duty caused Plaintiffs any losses. Those legal and factual questions are unrelated to the details of the Plan. The references to the Plan, if any, "would be remote and incidental." Miara, 379 F.Supp.2d 20, 58, 64, 65 (D.Mass. 2005). Thus, this case is not at all akin to Dudley Supermarket, Inc. v. Transamerica Life Ins. & Annuity Co., 302 F.3d 1 (1st Cir. 2002), where the claims at their "core" challenged allegedly deficient investment advice supplied by the plan's fiduciary investment advisor, or to Zipperer v. Raytheon Co., 493 F.3d 50 (1st Cir. 2007), where the defendant's responsibilities for recordkeeping arose from the plan. In such circumstances, state law scrutiny would conflict with "ERISA's proscription against state law mandating plan administration and would also impermissibly create an alternative enforcement scheme to ERISA's own recordkeeping and reporting requirements." Zipperer v. Raytheon Co., 493 F.3d at 54 (internal quotation marks and citations omitted).

ERISA does not govern the recommendations made, even by ERISA fiduciaries, outside the scope of their ERISA roles and not related to the specifics of Plan administration or asset management. Nor will the Court have to consult the Plan to resolve the post-retention claims.

Thus, the state law post-retention claims are not preempted by ERISA.[4]

---

misrepresentation claim as an alternative enforcement mechanism to ERISA. That is not the case here.

[4] In denying the motion to remand, the Court determined that the post-retention claims were preempted under Section 502's complete preemption provision such that the post-retention claims, though pled under state law, were really federal claims for purposes of a subject matter jurisdiction analysis. Doc. No. 36 at 15-16; see also Aetna Health Inc. v. Davila, 542 U.S. 200 (2004). At that time, the Court was of the view that the allegations of the complaint implicated a functional

2. <u>The state law causes of action state a claim</u>

Defendants' arguments that the state law causes of action fail to state a claim for relief are also unavailing. Defendants' arguments regarding Plaintiffs' post-retention negligent misrepresentation claim (Count IV) mirror their arguments regarding Plaintiffs' pre-retention negligent misrepresentation claim (Count I) and fail for the same reasons.

Defendants' argument regarding Count V—that "fatal" to Plaintiffs' claim for a breach of the covenant of good faith and fair dealing is the fact that "Plaintiffs do not allege that Defendants had obligations with respect to the administration of the Plan anywhere in the contract," Doc. No. 41 at 24—also misses the mark. "[E]very contract in Massachusetts is subject to an implied covenant of good faith and fair dealing." <u>Robert and Ardis James Foundation v. Meyers</u>, 48 N.E.3d 442, 449 (Mass. 2016). "[T]he implied covenant exists so that the objectives of the contract may be realized." <u>Ayash v. Dana-Farber Cancer Inst.</u>, 822 N.E.2d 667, 684 (Mass. 2005), cert. denied sub nom. <u>Globe Newspaper Co. v. Ayash</u>, 546 U.S. 927 (2005). Plaintiffs' various allegations that Defendants' actions and omissions deprived Plaintiffs of the benefit of their contract suffice to state, plausibly, a claim for a breach of the covenant of good faith and fair dealing.

---

fiduciary role for Defendants with respect to the challenged conduct. That is no longer the case. While the subject matter jurisdiction analysis may differ from whether the same allegations suffice to state a claim under Fed. R. Civ. P. 12(b), with the benefit of further briefing, argument, and research, the Court has refined its adjudication and understanding of the issues. Under <u>Davila</u>, complete preemption applies when the plaintiffs "at some point in time, could have brought [their] claim under ERISA § 502(a)[], and where there is no other independent legal duty that is implicated by a defendant's actions." 542 U.S. at 210. The Court now concludes complete preemption does not apply to the post-retention state law claims. Section 502(a) has no application here because the allegations concern conduct outside the scope of the ERISA relationship, and Massachusetts law imposes an independent duty with respect to the alleged conduct. Notably, Plaintiffs' claims challenge the <u>recommendations</u> made by Defendants, which is well outside the scope of ERISA, not the <u>administration</u> of the Plan by QPSI.

And finally, Defendants assert that "Plaintiffs' claim under Mass. Gen. Laws ch. 93A also fails because the Amended Complaint contains no allegations of 'extreme' or 'egregious' behavior, as required to state a claim under Mass. Gen. Laws ch. 93A." Doc. No. 41 at 24. As an initial matter, liability under Chapter 93A need not be based on extreme or egregious behavior but may instead be based on other causes of action, such as a breach of the covenant of good faith and fair dealing or negligent misrepresentation. See, e.g., Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc., 864 N.E.2d 518, 539 (Mass. App. 2007) (defendant's breach of covenant of good faith and fair dealing "would provide an independently sufficient basis for the finding that it violated c. 93A.") (citing Massachusetts Employers Ins. Exchange v. Propac-Mass, Inc., 648 N.E.2d 435 (Mass. 1995)); id. n.55 ("Even negligent misrepresentation can be a proper basis for the imposition of c. 93A liability.") (citing Glickman v. Brown, 486 N.E.2d 737 (1985)); id. at 540, n.57 ("Failure to disclose a material fact that causes a party to act differently with respect to a transaction than it otherwise would have has been held sufficient to support a finding of c. 93A liability in a business context.").

Moreover, Plaintiffs' allegations that in order to secure the investment advisory contract in a low-cost bundled manner along with QPSI, Defendants repeatedly vouched for and recommended QPSI as an able plan administrator, all the while knowing that QPSI had never handled a plan as large as Plaintiff Plan and that it was ill-equipped to do so because it focused its business model on much smaller plans and carried no insurance, are sufficient to constitute allegations of extreme or egregious behavior.

The Court therefore DENIES Defendants' motion to dismiss Counts IV – VI of the Complaint.

IV.     CONCLUSION

For the foregoing reasons, the Court ALLOWS Defendants' motion to dismiss Count III of the Complaint but otherwise DENIES Defendants' motion (Doc. No. 40). The Notice of Removal predicated federal jurisdiction on the complete preemption arising from Section 502. Doc. No. 1. As explained, the Court has concluded that that basis for jurisdiction does not apply. Count III no longer supplies a basis for subject matter jurisdiction in light of its dismissal. Based on the Amended Complaint, the Court concludes that the parties are not diverse and notes that Defendants did not advance that ground as an alternative basis for federal jurisdiction. Because this case has not yet progressed passed the Rule 12 stage, the Court declines to exercise supplemental jurisdiction over the remaining state law claims, assuming without deciding that it has the authority to do so. Accordingly, the Court REMANDS this matter to the Superior Court.

Given these rulings, Plaintiffs request fees. Doc. No. 45 at 14. This request is DENIED. In light of the complicated and difficult nature of the issues presented as well as the candid arguments and thoughtful briefing of counsel for both Plaintiffs and Defendants, the Court declines to award fees as such an award would not be just under the circumstances.

                                                SO ORDERED.

                                       /s/ Leo T. Sorokin
                                      Leo T. Sorokin
                                      United States District Judge